PETTIGREW, J.
*824 In this case, plaintiffs challenge the trial court's January 6, 2017 judgment, dismissing their claims against defendant, Ohio Security Insurance Company ("Ohio Security"), with prejudice. For the reasons that follow, we reverse and remand for further proceedings.
FACTS AND PROCEDURAL HISTORY
This matter arises in connection with a lawsuit filed by plaintiffs, Calandra F. Carr, individually, and Louis Carr, on behalf of their minor children, Louis Carr, Jr. and Ciara Carr, against defendants, Anthony Amedee and Amedee's liability insurer, Louisiana Farm Bureau Casualty Insurance Company ("Farm Bureau"); Geaux Clean Express Car Wash ("Geaux Clean") and its insurer, Ohio Security; and Allstate Property and Casualty Insurance Company ("Allstate") as the Carrs' UM insurers. According to the petition, Calandra was operating her 2008 Chevrolet Uplander van, with her minor children as passengers, and traveling through Geaux Clean directly behind a 2013 Ford F150 driven by Jeffrey Dykes. Amedee's 2006 Nissan Titan pickup truck was directly in front of Dykes' truck in the car wash. Amedee's truck "suddenly and without warning move[d] backwards striking [the Dykes] vehicle ..., causing the Dykes vehicle to then strike the front of the Plaintiffs' vehicle, causing the collision as well as the Plaintiffs' injuries, damages, and losses complained of herein." Plaintiffs asserted that Amedee's failure to maintain proper control of his vehicle and his careless operation of his vehicle were the proximate causes of the collision. Plaintiffs further alleged numerous acts of fault, gross and wanton negligence, and lack of skill by Geaux Clean as the proximate cause of the collision, i.e., failing to properly maintain the car wash; careless operation of the car wash and its mechanical systems; and inadequate supervision, training, and management of the car wash and its employees.
In response to plaintiffs' claims, Ohio Security filed a motion for summary judgment, alleging that plaintiffs are incapable of proving that their injuries, damages, and losses complained of were caused by Geaux Clean's careless operation of the car wash or its mechanical system. Rather, Ohio Security argued that plaintiffs' injuries were caused entirely by Amedee's accidental gear movement or negligence. Thus, Ohio Security maintained it was entitled to summary judgment as a matter of law.
*825 In support of its motion for summary judgment, Ohio Security offered excerpts of deposition testimony from Calandra; Amedee; Cameron Brown (a former employee of Geaux Clean); and Dykes. Plaintiffs filed a memorandum in opposition to the motion for summary judgment. Plaintiffs alleged that there were still many unresolved questions regarding Geaux Clean's liability and that the conflicting testimonies of Amedee and Dykes required a credibility determination that was improper on summary judgment. In support of their position, plaintiffs relied on the deposition testimony submitted by Ohio Security, in addition to deposition testimony submitted by Amedee and Farm Bureau in their opposition to the motion for summary judgment.[1] Plaintiffs also offered the East Baton Rouge Sheriffs Office incident report prepared by Corporal Nicholas Tullier, which was struck as inappropriate summary judgment evidence by the trial court at the hearing below.
Following a hearing, the trial court found no genuine issues of material fact. A written judgment was subsequently signed by the trial court on January 6, 2017, granting summary judgment in favor of Ohio Security and dismissing plaintiffs' claims against it with prejudice. The instant appeal by plaintiffs[2] followed, wherein plaintiffs alleged the trial court erred as follows:
1. The Trial Court erred by granting summary judgment because there is evidence that Geaux Clean carelessly operated the car wash and negligently trained and/or supervised its employees.
2. The Trial Court erred by granting summary judgment because Anthony Amedee and Jeffrey Dykes presented conflicting testimony regarding whether Amedee was in reverse when he entered the car wash.
3. The Trial Court erred by striking Corporal Tullier's report as inadmissible summary judgment evidence when it falls under an exception to rule against hearsay.[3 ]
SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. All Crane Rental of Georgia, Inc. v. Vincent, 2010-0116, p. 4 (La. App. 1 Cir. 9/10/10), 47 So.3d 1024, 1027, writ denied, 2010-2227 (La. 11/19/10), 49 So.3d 387. After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. La. Code Civ. P. art. 966(A)(3). The only documents that *826 may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions. La. Code Civ. P. art. 966(A)(4).
The burden of proof rests on the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. Code Civ. P. art. 966(D)(1). If, however, the movant fails in his burden to show an absence of factual support for one or more of the elements of the adverse party's claim, the burden never shifts to the adverse party, and the movant is not entitled to summary judgment. LeBlanc v. Bouchereau Oil Co., Inc., 2008-2064, p. 4 (La. App. 1 Cir. 5/8/09), 15 So.3d 152, 155, writ denied, 2009-1624 (La. 10/16/09), 19 So.3d 481.
Appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Bouquet v. Williams, 2016-0134, p. 5 (La. App. 1 Cir. 10/28/16), 206 So.3d 232, 237, writs denied, 2016-2077, 20162082 (La. 1/9/17), 214 So.3d 870, 871. Thus, appellate courts ask the same questions that the trial court does in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 26 (La. 7/5/94), 639 So.2d 730, 750.
In ruling on a motion for summary judgment, the trial court's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. Guardia v. Lakeview Regional Medical Center, 2008-1369, p. 3 (La. App. 1 Cir. 5/8/09), 13 So.3d 625, 628. A trial court cannot make credibility decisions on a motion for summary judgment. Monterrey Center, LLC v. Ed.ucation Partners, Inc., 2008-0734, p. 10 (La. App. 1 Cir. 12/23/08), 5 So.3d 225, 232. In deciding a motion for summary judgment, the trial court must assume that all of the witnesses are credible. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, pp. 16-17 (La. 2/29/00), 755 So.2d 226, 236. Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent's favor. Willis v. Medders, 2000-2507, p. 2 (La. 12/8/00), 775 So.2d 1049, 1050.
Ohio Security filed the instant motion for summary judgment seeking dismissal from this action on the basis that plaintiffs' injuries, damages, and losses complained of were caused entirely by the negligence or accidental gear movement of Amedee, and nothing else. Ohio Security introduced excerpts from several depositions in support of its motion for summary judgment, arguing there was no evidence that Geaux Clean had operated the car wash or its mechanical system in a careless manner.
According to Amedee's deposition testimony, he did not believe his vehicle was in reverse when he entered the car wash, but rather thought it was in neutral. Amedee indicated that he could only "make an assumption"
*827 that he "must have been in reverse." Amedee further testified that if he did in fact put his vehicle in reverse when he entered the car wash, it was done in error on his part, not willingly. Amedee did acknowledge that this was the first time he had been to Geaux Clean and that he had never been to a similar car wash. Rather, Amedee testified that he usually had his car washed at facilities where he would drop his vehicle off and wait for it to be washed.
Dykes, the driver of the vehicle directly behind Amedee in the car wash, testified that he was observing Amedee's vehicle in the car wash. He initially testified as follows:
I had mentioned to my wife that it looked like his reverse lights were on, but it was only the left reverse light. And then whenever they started to pull him through, I told her, you know, maybe it's just his parking light-I mean, his running light, or maybe there's a short in a wire or something like that, because obviously, it was pulling him forward, but the light was on ....
However, when questioned further, Dykes clarified that the left rear light "was always red" and that he "didn't see any variation in the light color." Dykes went on to testify about what happened next as he observed it:
Q. So at this point, you're watching him, and he goes in because the thing is pulling him through, correct?
A. Correct.
Q. At that point, I imagine you pulled up for you to be the next person to go through?
A. I kind of waited because of the light being on, and whenever he passed the attendant, the attendant looked down and saw that the light was on, and he tried to notify another attendant, and when he couldn't get his attention, he went in-I guess the car washes have a little sidewalk on the side of them. He went in there, and then he come back out, and then that's when I pulled forward. So, normally, you're probably 6 to 8 feet between rear bumper and front bumper on a vehicle when you go-pretty close. And this time, I was probably a car length and a half behind him, car length, car length and a half.
Q. Did you have any conversations with this attendant?
A, No.
Q. So these things that you were talking about, as far as the two attendants talking to each other, did you hear them saying anything?
A. I did not. I don't-he didn't really talk to him. He couldn't get the other one's attention. I just saw him trying to flag him down after he looked down at the light.
Q. It's pretty noisy right there?
A. Correct. And that's probably why he didn't hear him. Just guessing.
The only representative from Geaux Clean to testify was Brown, the site manager of the car wash at the time of the incident. According to Brown's deposition testimony, although he was not working at the time of the incident, he was called immediately to handle the situation and was one of the few people to actually see the security footage of what happened.[4] Brown stated he could see all three of the vehicles in question being loaded into the car wash. And, as Amedee's vehicle entered the exit and the rollers were about to push the vehicle out of the car wash *828 bay, Brown "saw the reverse lights [of Amedee's vehicle] come on." Brown indicated that the reverse lights were not on when Amedee entered the car wash. Brown described Amedee's vehicle as "coasting backwards" as its ball hitch impacted the Dykes' vehicle. This impact caused the Dykes' vehicle to jump the two rollers behind his vehicle, resulting in the collision with plaintiffs' vehicle.
Brown further testified regarding the operation of the car wash and the training of the attendants. With regard to the policies concerning the day-to-day operation of the car wash, Brown indicated that there was no written employee handbook, although he was in the process of trying to create one during his time at Geaux Clean. Rather, Brown stated that everything the attendants knew about the operation of the car wash and troubleshooting was from on-the-job training. When asked to describe how the car wash worked, Brown testified as follows:
Q. ... Can you just tell me generally how the car wash works like from the time a car pulled up, what goes on?
A. Okay. Once the car pays for their car wash at the pay station and that swing arm raises, they pass over-there is a magnetic strip embedded in the concrete that actually senses them drive over, so it enters their wash into the wash system. And when they pull up, the attendant loads them onto the conveyor rail. And we pull them up past a certain point to give enough space from where the actual rollers deploy that will push the car through the car wash.
So once we motion for them to stop, we have signs, you know, that instruct them to place their vehicle in neutral, foot off the brake and, I believe, windshield wipers was the other thing on the sign.... And the computer system will deploy two set[s] of rollers behind the rear tire and it begins pushing the vehicle through the car wash.
....
Like I said, the system sends two [sets of rollers] at a time so that in the event-like I said, there is no human error on the part of the car wash, the system is computerized. So in the event that the driver puts their foot on the brake, you know, has-something goes wrong and they jump that first roller, there is a second roller to continue pushing them to prevent from them making contact with the vehicle behind them. So it is kind of like a built in fail safe to keep the system moving, because the worst thing that can happen in the car wash is people stopping, because the system is moving and once things stop moving, it doesn't go well.
Q. Does the car wash-can it operate in reverse?
A. No.
Q. Okay. So the conveyor belts can't move backwards?
A. It has to go one way. And once it gets-those rollers get to the end of the tunnel, they flip underneath a steel plate and they just loop down and go back underneath the conveyor back to the end where they are sent back up.
....
Q. Now, about how much space did the attendants leave in between cars?
A. We tried to give about 10 feet, 8 to 10 feet.
Q. Now, is an attendant-are they looking to see that the drivers are obeying, that they are taking their hands off, and that they put their car in gear?
A. Generally, we can look inside there and we will make sure, you know. Because usually if something goes wrong, it will go wrong fairly soon within someone actually entering the wash bay, because *829 we had a large problem with people leaving their vehicle in drive just as they began, just not thinking. So they will put their foot off of the brake and they would start idling forward. We would have to make sure they stop.
So, generally, they would look to make sure that that person did something with their gear shift, you know, that would tell us that they were following our directions.
Q. And if they observed someone going through the car wash in the wrong gear, for example, their brake lights are on or their reverse lights on, what would they do?
A. We have an emergency stop on the keypad. It is a control box right near where the windmaster sign is, right in front of it near the office window, and they hit that emergency stop and usually run into the tunnel to make sure that, you know, they don't impact somebody in front of them. We are hands on the window trying to make sure that they put it in neutral and make sure their foot is off the brake.
Q. And how did they know to do that, are they trained with those processes?
A. Generally, yes. We try to make sure that they do know how to troubleshoot. Because, like I said, dealing with vehicles in an automatic car wash setting, it leaves a lot that can happen. And, like I said, it is hard to blame, you know, if a woman is in a car and she has got three kids screaming in the backseat and she forgets to put her vehicle in neutral, it is life, it happens. So we try to make sure that they understand that there are times where ... you are going to have to-when you are on duty sending vehicles through the wash and it is your responsibility because when that person is [there] by themselves or with two people ... so they did understand that there were going to be times where they had to go in there and make sure people were doing what they were supposed to be doing, which is why we had that rule, especially if there were two people there, we had somebody walking cars through the tunnel almost constantly just to maintain, you know, visual contact to make sure they don't see brake lights in the tunnel, and so they can stop-stop things. We have another emergency stop inside the tunnel so they can stop things before something happens, which is ultimately our goal was to stop things before it becomes obvious.
....
Q. If an attendant saw a vehicle going in in the wrong gear and they didn't push the emergency stop, should they have allowed another vehicle to enter?
A. No.
Ohio Security argues on appeal that plaintiffs presented no evidence to support their claims against Geaux Clean. Ohio Security maintains that plaintiffs' case was based on nothing more than allegations and that plaintiffs "failed to submit any actual, competent, sworn testimony to establish that the employees were not properly trained, or that any vehicle entered the car wash in reverse or that any employee could have seen the Amedee vehicle move in reverse when it did." A review of the deposition testimony in the record clearly reveals otherwise.
Amedee has no idea how this accident happened. He knows of nothing that he did to actually cause his vehicle to go into reverse, but can only assume that he put his vehicle into reverse at some point. Dykes testified that he saw the left rear light of Amedee's vehicle illuminated red when it entered the car wash. Moreover, Dykes indicated that as Amedee's vehicle passed the car wash attendant, it appeared *830 to him that the attendant noticed the light on Amedee's vehicle and tried to flag down another attendant, who was further into the car wash at the time, but to no avail. This testimony, coupled with Brown's testimony concerning how the attendants were trained to press the emergency stop button if they observed a vehicle going through the car wash in the wrong gear, demonstrates that this matter was not appropriate for summary judgment.
Based on our review of the record, it is apparent the trial court improperly weighed the evidence in finding Geaux Clean bore no fault for the cause of this accident. As previously indicated, any doubt as to a dispute regarding a material issue of fact must be resolved against granting a motion for summary judgment and in favor of a trial on the merits. See Willis, 2000-2507 at 2, 775 So.2d at 1050. Moreover, in deciding a motion for summary judgment, the trial court cannot make credibility determinations, evaluate testimony, or weigh evidence. See Smith, 93-2512 at 27, 639 So.2d at 751. In the instant case, the question is whether Geaux Clean failed to maintain the car wash, carelessly operated the car wash, or failed to adequately train and supervise its employees. The evidence before the trial court sufficiently raised genuine issues of material fact for the trier of fact to consider when determining whether the injuries suffered by plaintiffs were caused by any negligence on the part of Geaux Clean. These factual issues cannot be resolved without weighing the evidence and making credibility determinations, which are matters for the fact finder. In view of these unresolved issues of material fact, the trial court erred in granting summary judgment in favor of Geaux Clean, and the summary judgment must be reversed.
DECREE
For the above and foregoing reasons, we reverse the January 6, 2017 judgment rendered in favor of Ohio Security Insurance Company and remand for further proceedings consistent with this opinion. We assess all costs associated with this appeal against defendant, Ohio Security Insurance Company.
REVERSED AND REMANDED.
Penzato, J. concurs
Crain, J. dissents w/ assign reasons
Guidry, J. concurs

In opposition to the motion for summary judgment, Amedee and Farm Bureau introduced excerpts of deposition testimony from Amedee, Dykes, and Brown, some of which was repetitive of what was offered by Ohio Security.

In addition to the appellate brief filed by plaintiffs in this matter, the other party defendants in this case-Allstate, and Amedee and Farm Bureau (collectively referred to here as "Farm Bureau")-also filed briefs with this court. However, these briefs were filed as appellee briefs, rather than appellant briefs. Nonetheless, Allstate and Farm Bureau both argue in brief that the trial court's judgment was in error and should be reversed, basically adopting the plaintiffs' argument on appeal. We note that as neither Allstate nor Farm Bureau has appealed or answered the appeal in this case, neither party is entitled to any relief on appeal. La. Code Civ. P. art. 2133 ; see Augustus v. St. Mary Parish School Bd., 95-2498, p. 16 (La. App. 1 Cir. 6/28/96), 676 So.2d 1144, 1156.

Because we are reversing the summary judgment rendered in this matter, we do not reach consideration of this issue on appeal.

We note that at the time of the summary judgment hearing below, the security footage was no longer available because the building had been struck by lightning.